**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:25-cr-00466-IM |
| v. | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |
| **JOSE GUADALUPE VALDEZ, JR.**, | |
| Defendant. | |

Nicole Marie Hermann and Steven Scott Chamberlin, Assistant United States Attorneys, and Scott E. Bradford, United States Attorney, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Attorneys for the United States of America.

Robert Hamilton and Justine Mitsuko Bonner, Federal Public Defender District of Oregon, 101 SW Main Street, Suite 1700, Portland, OR 97204. Attorneys for Defendant.

**IMMERGUT, District Judge.**

Before this Court is Defendant's Motion to Suppress Statements ("Mot."), ECF 23.

Defendant is charged with unlawful possession of a firearm in violation of 18 U.S.C. §

922(g)(1),[1] possession in a firearm in furtherance of drug trafficking in violation of 18 U.S.C. §

---

[1] Defendant was originally charged under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(l). Indictment, ECF 1 at 1. This Court granted Defendant's motion to dismiss the armed career

PAGE 1 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

924(c)(1)(A)(i), and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Indictment, ECF 1. Defendant seeks to suppress all statements and other evidence obtained as the result of his warrantless arrest in his front yard on May 11, 2025. Mot., ECF 23 at 1, 5. Defendant argues that his statements must be suppressed because officers lacked probable cause to arrest him and trespassed on the curtilage of his home for the purpose of arresting him. *Id.* at 1–2.[2] The government filed a response to Defendant's motion ("Resp."), ECF 34, to which Defendant replied ("Reply"), ECF 38. This Court held a hearing on Defendant's Motion to Suppress on June 16, 2026, ECF 40. This Court heard testimony from three witnesses. Defendant also offered the exhibits cited in the briefing, and those exhibits were all admitted without objection.

For the reasons set forth below, this Court concludes that the officers had probable cause to arrest Defendant. In addition, the officers did not need an arrest warrant because they did not trespass onto the curtilage of Defendant's home when arresting him. Therefore, the officers did not violate Defendant's rights under Fourth Amendment. Defendant's Motion to Suppress, ECF 23, is denied.

## STANDARDS

The Fourth Amendment, both on its own against the federal government, and as incorporated against the States by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

criminal allegation based on the government's representation that it did not intend to proceed with the allegation. Order, ECF 41.

[2] Initially, Defendant argued that that his statements must be suppressed because officers failed to read him his *Miranda* warnings before interviewing him. *See* Mot., ECF 23 at 7–8. However, Defendant withdrew this argument at the hearing. Therefore, this Court does not address Defendant's arguments under *Miranda*.

PAGE 2 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

and seizures, shall not be violated." U.S. Const. amend. IV; *see Mapp v. Ohio,* 367 U.S. 643, 655 (1961). "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005). However, the government bears the burden of establishing that a warrantless search or seizure was reasonable. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).

## BACKGROUND[3]

On May 11, 2025, at approximately 1323 hours, Deputy Michael Vargas of the Washington County Sheriff's Office responded to a report of shoplifting at Coastal Farm and Ranch in Cornelius, Oregon. Mot., Ex. 1, ECF 23-1 at 4. Deputy Vargas quickly located a vehicle believed to be associated with the suspected shoplifter and pulled over its driver, Teshia Hutchinson, who was alone in the car. *Id.* at 11–12. At the hearing, Deputy Vargas testified that when he approached the car, he observed clothing items and Danner boots sitting on the front seat as well as a black backpack on the floor of the front passenger seat. Ms. Hutchinson said she and a male passenger were involved in the shoplifting and that the items on the front seat were the things that she had taken. Ms. Hutchinson admitted to taking a pair of Danner boots and

---

[3] At the motions hearing, this Court received live testimony from three witnesses: Washington County Sheriff's Deputy Michael Vargas, Washington County Sheriff's Deputy Nolan Hansen, and ATF Special Agent Nathan Miller. This Court finds the testimony of all three witnesses to be credible. In preparing this order, the final transcript of the hearing is not yet available. Accordingly, this Court cites only to the exhibits to the parties' pleadings. Where facts are referred to without any citation, this Court is relying on the hearing testimony.

PAGE 3 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

seven shirts. *Id.* at 5. Vargas placed her in the back of his patrol car. *Id.* Ms. Hutchinson gave consent for Vargas to seize the stolen items. *Id.*

At the hearing, Deputy Vargas testified that Ms. Hutchinson gave consent to search the vehicle. In his initial search, Vargas seized the stolen items and observed tinfoil in the center console with a small pill that he believed to be fentanyl. Vargas left the black backpack in the car, intending to retrieve it later. After observing the apparent fentanyl, Vargas returned to his patrol car to speak with Ms. Hutchinson. Ms. Hutchinson told Vargas that there was another person with her in the store when she was shoplifting and that the black backpack in the car did not belong to her. *Id.* at 11–12. Ms. Hutchinson told Vargas that once she had stolen various items, she returned back to the car and expected the man with whom she had driven to the store to be there. *Id.* He was not at the car, so Ms. Hutchinson drove away alone because she was afraid to remain at the store after stealing the items.

Deputy Vargas returned to Ms. Hutchinson's vehicle and brought the black backpack to his patrol vehicle to search it. *Id.* at 5. Vargas located a leather shoulder style holster, a pouch with 9mm ammunition, a small silver hatchet that was entangled in the holster, a black car manual folder containing a black Smith and Wesson 9mm handgun, a long knife, a leather pouch with apparent marijuana and methamphetamine, new unused bags, and a digital scale with white powdery substance on it. *Id.* After searching the backpack, Vargas went back to speak again to Ms. Hutchinson; he asked her to identify the man who accompanied her to Coastal Farm and Ranch, and Ms. Hutchinson told Deputy Vargas that the man was "Wally" Valdez. *Id.* at 6. Vargas testified that Ms. Hutchinson identified Wally Valdez as the owner of the black backpack and that Wally Valdez lived in Cornelius, Oregon. Vargas testified that he was familiar with Jose Valdez from other drug-related investigations and knew that Jose Valdez had used "Wally" as a

PAGE 4 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

moniker. Vargas also knew that Defendant was a convicted felon. *Id.* at 8. At the hearing, Vargas testified that Ms. Hutchinson told him she had spent the previous night at Defendant's house.

Vargas then contacted the Westside Interagency Narcotics Team and broadcasted information about Defendant to see if other officers could start looking for him. *Id.* at 6. Vargas knew that there was a current drug investigation involving Defendant and that the Washington County Sheriff's Office had installed a camera to monitor his house. *Id.* Vargas learned that Deputy Nolan Hansen of the Washington County Sheriff's Office was the investigating deputy assigned to the drug investigation involving Defendant; Hansen told Vargas that he would respond to assist. *Id.* Vargas showed Ms. Hutchinson a recent photo of Defendant, and she confirmed that Defendant was the man she knew as "Wally," who had accompanied her to the store. *Id.* Deputy Vargas testified that the Coastal Farm and Ranch was about two miles from Defendant's residence and officers traveled to Defendant's residence to see if he had returned home. Those officers confirmed that a white Nissan SUV with Oregon plates arrived earlier with an older male driving, and that a male passenger was dropped off at Defendant's residence. *Id.* As the investigation continued, officers determined that the white Nissan was driven by Defendant's father who had dropped Defendant off at the Defendant's residence.

Ms. Hutchinson agreed to call the Defendant so that officers could hear what Defendant said about the backpack. *Id.* But while Deputy Vargas was still speaking to Ms. Hutchinson, a caller, who was saved in Ms. Hutchinson's contacts as "Wally," called Ms. Hutchinson's phone, and officers let the call go to voicemail. *Id.* Shortly after, at 1347, Ms. Hutchinson's phone received threatening texts from the same "Wally," demanding she "bring [his] shit now." *Id.* at

PAGE 5 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

7.[4] Deputy Nolan Hansen of the Washington County Sheriff's Office concluded that "[b]ased on [his] training and experience," those texts were "a threat of harm to Hutchinson's father if Valdez's belongings were not returned to him." *Id.*, Ex. 3, ECF 23-1 at 11. Ms. Hutchinson told Deputy Hansen that she went with Defendant to the store, asked him what boots he wanted, and offered to steal them for him. *Id.* Ms. Hutchinson told Hansen that Defendant pointed out a pair of men's boots and then separated from her; she stole the boots and some clothing and left the store. *Id.* at 11–12.

While speaking with Ms. Hutchinson, Deputy Vargas was notified by other officers that a white Nissan SUV matching the description of the car that dropped Defendant off at his residence, drove by. *Id.*, Ex. 1, ECF 23-1 at 7. Officers caught up to the vehicle and identified Defendant's father as the driver of the Nissan SUV. *Id.* At the hearing, Deputy Vargas testified that the license plate, make, and model of the car confirmed it was Defendant father's vehicle. *Id.* Washington County deputies also went to Defendant's residence and observed Defendant outside of his residence and determined that they had probable cause to arrest him for crimes connected to the gun and drug trafficking items found in the black backpack in Ms. Hutchinson's car. *Id.*; *see* Defense Ex. 4 at 0:38–1:05; Defense Ex. 5 at 0:35–1:09.

Officer body camera footage shows that in front of Defendant's house is an unfenced grass lawn adjacent to an open driveway which runs perpendicular to the street; and on the street side of the lawn, there is some gravel for street parking between the lawn and the street. Defense Ex. 5 at 0:42; Defense Ex. 4 at 0:41–0:45. There are some short plants on the back edge of the

---

[4] Specifically, the contact saved under "Wally" texted Ms. Hutchinson "Don't forget I know where your dad lives [] you wouldn't want anything to happen to him / would you [] bring my shit now / Or i [sic] go to Vancouver / Motherfucker / I'm giving you 15min. [sic]." Mot., Ex. 1, ECF 23-1 at 7.

PAGE 6 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

lawn near the house and between the lawn and concrete driveway. Defense Ex. 5 at 0:42–0:45. The lawn is readily visible from the public street and not enclosed in any way. *Id.* Body camera footage shows that as the arresting officer steps out of his vehicle, he calls out Defendant's first name. Defense Ex. 4 at 0:35. The officer then steps around to the back of his vehicle, holds out his right arm, and says "hands out of your pockets for me." *Id.* at 0:37–0:39. At this time, Defendant is standing in the front lawn and in front of the short plants near the house. *Id.* The officer then asks Defendant, "Can you walk toward me bud?" *Id.* at 0:40–0:41. Defendant walks toward the officer. *Id.* The arresting officer then steps onto the front lawn and then says, "just keep your hands out of your pockets for me." *Id.* at 0:46–0:48. Defendant continues to walk toward the officer. *Id.* The officer then tells Defendant that he is going to be detained and handcuffs him. *Id.* at 0:49–1:03. When he is handcuffed, Defendant appears to be standing roughly equidistant from his house and the adjacent public street. *Id.*; Defense Ex. 5 at 0:47–0:58. After his arrest, Defendant made statements to Deputy Hansen, which Defendant now seeks to suppress.

## DISCUSSION

In his motion, Defendant argues that his post-arrest statements must be suppressed because the officers (1) lacked probable cause to make a warrantless arrest and (2) trespassed on the curtilage of Defendant's home for the purpose of arresting him. This Court addresses each argument in turn.

### A. Probable Cause

A warrantless arrest in a public place requires probable cause. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Police may arrest a suspect if 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability

PAGE 7 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

that the defendant had committed a crime.'" *United States v. Price*, 980 F.3d 1211, 1225 (9th

Cir. 2019) (quoting *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004)).

Defendant argues that Ms. Hutchinson was not a sufficiently reliable witness and her account

was too untrustworthy to establish probable cause. Mot., ECF 23 at 6–7. In response, the

government argues that officers had probable cause based on text messages, witness statements,

and the physical evidence available to officers at the time. Resp., ECF 34 at 8–9.

Here, evaluating the totality of the circumstances, this Court finds that officers had

probable cause to arrest Defendant for unlawful possession of a firearm and methamphetamine.

In his search of the backpack at issue, Deputy Vargas located a firearm and suspected

methamphetamine. Vargas also located other indicia of drug trafficking, including packing

materials such as unused bags and a digital scale with white powder residue. Ms. Hutchinson

made statements regarding Defendant's involvement in the store theft, and the incriminating

black backpack was found on the floor of her front passenger seat. In addition, the officers were

able to corroborate various aspects of her account. As described above, Ms. Hutchison told

officers that the black backpack in her vehicle belonged to "Wally Valdez" from Cornelius.

Deputy Vargas was familiar with a Jose Vargas from Cornelius, who used the "Wally" moniker,

from past law enforcement investigations.[5] Vargas knew Defendant was a convicted felon and

---

[5] Defendant also argues that Vargas "held a grudge" against Defendant and prompted Ms. Hutchinson to make a suggestive identification of Defendant. Mot., ECF 23 at 7. However, an officer's alleged grudge is not relevant for addressing whether there was probable cause, an objective standard. *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004)) ("Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest."). Further, Ms. Hutchinson's identification of Defendant was not prompted by suggestions from the police. Rather, it was Ms. Hutchinson who brought up Mr. Valdez's name *before* Deputy Vargas had reason to know Mr. Valdez was involved in the theft.

PAGE 8 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

prohibited from possessing firearms, and moreover, that the Westside Interagency Narcotics Team was investigating Defendant for drug crimes and had installed a camera facing his house. Vargas showed a photo of Jose Valdez to Ms. Hutchinson, and she confirmed it was the same man. While she was detained, Ms. Hutchinson's phone also received a call from a contact saved as "Wally." When she did not answer the phone, Ms. Hutchinson's phone then received threatening texts from that same contact. Deputy Hansen reasonably determined that "[b]ased on [his] training and experience," those texts were "a threat of harm to Hutchinson's father if Valdez's belongings were not returned to him." Mot., Ex. 3, ECF 23-1 at 11. That context—Ms. Hutchinson volunteering the backpack was Defendant's, Defendant's phone call, and the subsequent threatening texts—supports that Defendant was demanding return of the gun and drug evidence and corroborates that the black backpack was his.

Other context also corroborates Ms. Hutchinson's account of the day's events. Ms. Hutchinson told law enforcement that she went to the store with Defendant. She said that when she returned to the car after shoplifting, Defendant was not there. Nervous about having just shoplifted, she did not wait and drove away without Defendant. Shortly after, officers outside Defendant's residence, which is approximately two miles away from the store, saw an older man drive a white SUV and drop off a male passenger, whom officers later concluded was Defendant. Deputy Vargas later saw that white SUV drive by where he was staged and confirmed the vehicle belonged to Defendant's father. This evidence suggests that after Ms. Hutchinson left the store without Defendant, Defendant's father picked him up and drove him home, and later, Defendant's father drove more in the area. It was therefore reasonable for officers to infer that the black backpack and its contents belonged to Defendant. And as stated above, Deputy Vargas knew that Defendant was a felon and the subject of an ongoing drug investigation. These

PAGE 9 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

circumstances confirm that there was a fair probability that Defendant unlawfully possessed a firearm and methamphetamine. So in sum, after reviewing all of the evidence and hearing live testimony, this Court finds that under the totality of the circumstances, officers reasonably concluded that that they had probable cause to arrest Defendant for drug trafficking and being a felon in possession of a firearm.

## B.  Curtilage

Under the Fourth Amendment, an arrest inside of a person's home requires a warrant. *Payton v. New York*, 445 U.S. 573, 576 (1980). The curtilage of a home is protected as if it was part of the home itself. *Collins v. Virginia*, 584 U.S. 586, 593 (2018); *Florida v. Jardines*, 569 U.S. 1, 6 (2013). In the Supreme Court's most recent decision on the issue, the Court noted that "[t]he conception defining the curtilage is . . . familiar enough that it is easily understood from our daily experience." *Collins*, 584 U.S. at 593 (citation modified). Specifically, curtilage includes "the front porch, side garden, or area outside the front window." *Id.* (citation modified).

Courts "consider four factors in determining whether an area is curtilage: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Duenas*, 691 F.3d 1070, 1081 (9th Cir. 2012) (citing *United States v. Dunn,* 480 U.S. 294, 300 (1987)). These factors, known as the *Dunn* factors after the Supreme Court's decision in *United States v. Dunn,* 480 U.S. 294 (1987), are "useful analytical tools only to the degree, in any given case, that they bear upon whether" the area at issue is "intimately tied to home." *Dunn*, 480 U.S. at 301. And the visibility of an area from the street "is not dispositive." *Collins*, 584 U.S. at 597 n.3.

Defendant contests the relevance of the *Dunn* factors, relying on out-of-circuit and Supreme Court precedent to argue that the *Dunn* factors no longer apply. Reply, ECF 38 at 2–5.

PAGE 10 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

This Court is unpersuaded. As for Supreme Court precedent, Defendant is correct that the Supreme Court's two most recent curtilage cases, *Collins* and *Jardines*, did not apply the *Dunn* factors despite the fact that neither case involved fenced properties. *Id.* at 3. But, not applying a legal framework is not the same thing as overruling it, and courts in the Ninth Circuit addressing curtilage issues after the 2018 *Collins* and the 2013 *Jardines* decision have continued to use the *Dunn* factors as an analytical tool. *See, e.g., United States v. Dawson*, No. CR 24-00089 MWJS, 2026 WL 125636, at *10 (D. Haw. Jan. 16, 2026) (applying the *Dunn* factors to assess if an area was curtilage); *United States v. Kelly*, No. 4:20-CR-00191-DCN, 2021 WL 2109189, at *3 (D. Idaho May 25, 2021) (same); *United States v. Lee*, No. 321CR00117TMBSAO, 2023 WL 4706914, at *4 (D. Alaska July 24, 2023) (same). The *Dunn* factors continue to function as a guidepost for assessing whether the area at issue is "'intimately tied to home.'" *Dunn*, 480 U.S. at 301. The *Dunn* factors are a useful guidepost here, and as explained below, reinforce that Defendant did not take steps to convert his front lawn into an area so intimately tied to the home as to merit Fourth Amendment protection.

Defendant's reliance on his home's urban location is similarly unavailing. *See* Reply, ECF 38 at 2–3. To the extent that the Ninth Circuit has addressed the issue, it has held that the "the curtilage of a home in a rural area" extends farther "than the curtilage of a home in an urban or suburban setting." *United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001). So, the fact that Defendant's home is in an urban location undermines, rather than enhances, his case for suppression.

Here, officers did not trespass on the curtilage of Defendant's home when arresting Defendant without a warrant. The body camera footage shows that Defendant's front lawn was clearly open, unfenced, visible from the street, and immediately adjacent to the public street.

PAGE 11 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defense Ex. 5 at 0:42–0:45. The footage shows that officers had an unobstructed view of Defendant standing in his front lawn. *Id.* Defendant exited his home of his own volition before any contact with officers and was visible from the street when officers walked a few steps onto the lawn and arrested him. *Id.* at 0:35–1:09. When officers approached Defendant, he was standing on the grass of his lawn, which is unenclosed, visible from the public street, and within what appears to be just a few feet from the public street. *Id.*

Defendant correctly notes that the ability to publicly view an area is not dispositive to the curtilage analysis. *See* Reply, ECF 38 at 2–3. However, Defendant has failed to provide any binding or in-circuit case where the unfenced front yard was curtilage. And, as the government argues, other courts addressing this issue have found that unfenced front yards were not curtilage. *See* Resp., ECF 34 (collecting cases).

While not dispositive, three of the four *Dunn* factors cut in favor of finding that Defendant's front lawn is not curtilage. The first factor, proximity of the area claimed to be curtilage, *Duenas*, 691 F.3d at 1081, could slightly favor Defendant. Defendant was standing in his front yard, on his lawn when officers arrested him. Defense Ex. 4 at 0:38–1:05; Defense Ex. 5 at 0:35–1:09. Regarding the second factor, Defendant's front lawn was clearly not "included within an *enclosure* surrounding the home." *Duenas*, 691 F.3d at 1081 (emphasis added); *cf. Collins* U.S. at 593 (finding a driveway enclosure was within the home's curtilage). The third factor, the nature of the uses to which the area is put, also cuts in the government's favor. An empty grass front lawn adjacent to a public street with no fencing is not a typical exemplar of an area "to which the activity of home life extends." *Jardines*, 569 U.S. at 7; *see id.* (finding a front porch was a classic exemplar of curtilage under the Fourth Amendment). Nor is a front lawn the type of area for any activities "intimately tied to home." *Dunn*, 480 U.S. at 301. Fourth, the lawn

PAGE 12 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

was unobstructed, visible from and close to the public street, and showed no "steps taken by [Defendant] to protect the area from observation by people passing by." *Duenas*, 691 F.3d at 1081 (citation modified).

Defendant's front lawn was open for anyone to view from the street, and "[b]y walking . . . up [Defendant's lawn], police could not learn more about [Defendant]'s home." *United States v. Moses*, 142 F.4th 126 (3d Cir. 2025). By stepping a few feet onto the open grass lawn where Defendant stood, the officers did not intrude upon the seclusion of Defendant's home when arresting him. Considering all evidence and testimony, this Court concludes that officers did not trespass onto the curtilage of Defendant's lawn, and thus, did not need a warrant or applicable exception to the warrant requirement to arrest him.

## CONCLUSION

Defendant's Motion to Suppress, ECF 23, is DENIED.

**IT IS SO ORDERED.**

DATED this 5th day of August, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 13 – ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS